IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:16-cv-2814-S |
| | § | |
| 0.2853 ACRES OF LAND, MORE OR LESS LOCATED IN DALLAS COUNTY, STATE OF TEXAS; CB TITTLE, LTD., AND AR1 LAND, LTD., | § § § § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

As the parties have previously explained in a joint filing, "[t]he United States filed this case on October 4, 2016 to acquire 0.2853 acres of land in Dallas, Texas for the Federal Aviation Administration's [(the "FAA")] continued operation of a Terminal Doppler Weather Radar. (Dkt. 1). The subject property is owned by CB Tittle, Ltd. and AR1 Land, Ltd. The ultimate question to be decided in this case is the amount of just compensation to be awarded for the property taken." Dkt. No. 27 at 1 (footnote omitted; citing *United States v. Reynolds*, 397 U.S. 14, 20 (1970)).

Under Federal Rule of Civil Procedure 71.1(h), "[i]n an action involving eminent domain under federal law, the court tries all issues, including compensation, except when compensation must be determined: (A) by any tribunal specially constituted by a federal statute to determine compensation; or (B) if there is no such tribunal, by a jury when a party demands one within the time to answer or within any additional

time the court sets, unless the court appoints a commission." FED. R. CIV. P. 71.1(h). Defendants CB/Tittle, Ltd. and AR1 Land, Ltd. have demanded a jury trial under Rule 71.1(h). *See* Dkt. No. 9 at 1.

But the parties have asked the Court to resolve a threshold legal issue under Rule 71.1(h) – "whether the existence of the Terminal Doppler Weather Radar should be considered in the before condition," which "issue directly affects how the expert appraisers will value the subject property, and should be decided before the parties exchange their respective reports." Dkt. No. 31 at 1. The Court granted the Joint Motion to Modify Scheduling Order to Suspend Deadlines to Adjudicate Threshold Legal Issue [Dkt. No. 31] and ordered that the parties brief "the threshold issue of whether the existence of the Terminal Doppler Weather Radar [("TDWR")] should be considered in the before condition," on which the Court would then hold an evidentiary hearing. Dkt. No. 32 at 1.

Defendants then filed their Brief on the Threshold Issue of Whether the Terminal Doppler Weather Radar Should Be Considered in Appraising the Before Condition of Defendants' Property [Dkt. No. 33], and the United States filed its Motion for a Legal Determination on the Before Condition of the Subject Property [Dkt. No. 34] (the "Motion for Legal Determination"). The parties then filed responses to each filing. *See* Dkt. Nos. 37 & 39. Defendants also filed a Motion Requesting an Evidentiary Hearing to Adjudicate Threshold Legal Issue [Dkt. No. 41] ("Motion Requesting Evidentiary Hearing").

United States District Judge Karen Gren Scholer referred the Motion for Legal Determination to the undersigned United States magistrate judge for recommendation under 28 U.S.C. § 636(b), ordered that the undersigned may convene a hearing, including an evidentiary hearing, if he determines that a hearing is necessary, and correspondingly referred the Motion Requesting Evidentiary Hearing to the undersigned under 28 U.S.C. § 636(b). *See* Dkt. No. 58 at 1.

The undersigned then granted the Motion Requesting Evidentiary Hearing and set an evidentiary hearing on the Motion for Legal Determination for May 11, 2018. *See* Dkt. No. 59. In advance of the hearing, the United States reported that "the parties reached a stipulation that eliminates the need to call witnesses at the evidentiary hearing." Dkt. No. 61 at 1.

The undersigned convened the evidentiary hearing on May 11, 2018, at which the United States's counsel and Defendants' counsel appeared. *See* Dkt. No. 63.

Based on the hearing and the parties' briefing, the undersigned now issues the following findings, conclusions, and recommendation.

**Background**

In 1993, the FAA entered into a ten-year lease to operate a TDWR on a 0.2853-acre tract (the "Property"). Three years later, the FAA constructed on the Property (1) a fence along its perimeter, (2) a single-story building, and (3) a fifty-five-foot lattice tower with a TDWR sphere affixed at the top (these three structures, collectively, will be referred to as the "TDWR facility").

In 2013, when the ten-year lease was set to expire, the Property's then-owner, Luminant Generation Co., LLC ("Luminant"), leased the Property to the FAA under a new lease agreement to begin on October 1, 2013, and to end on September 30, 2014 (the "one-year lease"). *See* Dkt. No. 35 at 7-15 of 46.

On September 30, 2014, the date on which the one-year lease term expired, Luminant sold the 24.125-acre tract of land that includes the Property to a new owner. And, on March 24, 2015, Defendants CB/Tittle, Ltd. and AR1 Land, Ltd. (collectively, "Defendants") acquired from the new owner a 68% and 32% undivided interest, respectively, in the 24.125-acre tract.

Between the one-year lease's expiration date and the date that Defendants gained an interest in the 24.125 acres, the FAA continued to occupy the Property and operate the TDWR facility. Defendants and the FAA attempted to negotiate a new lease or the voluntary sale of the Property, but their efforts were unsuccessful. On September 21, 2015, Defendants demanded that the FAA surrender possession of the Property. And, on October 4, 2016, the United States moved to acquire the Property by condemnation.

As discussed above, the central issue in this case is the amount of just compensation owed. The parties agree that where the United States condemns only a portion of a larger parcel of land (the "parent tract") – as it did here – the appropriate measure of damages is the difference between the value of the parent tract before the taking and its value after the taking. The parent tract in this case is the 24.125-acre

parcel encompassing the TDWR facility and the Property on which it sits. And the parties dispute whether – and to what extent – the TDWR facility should be considered in determining the parent tract's value before condemnation.

Specifically, Defendants and the United States dispute whether the regulatory restrictions imposed by an operational TDWR should affect the before-condemnation value of the parent tract. Defendants point to those restrictions contained in 49 U.S.C. § 44718, Structures Interfering with Air Commerce; 14 C.F.R. Part 77, Safe, Efficient Use, and Preservation of the Navigable Airspace; and FAA Order JO 7400.2L, Procedures for Handling Airspace Matters. These regulations require a person to provide notice to the FAA before constructing or altering any structure near an operational TDWR. The FAA then conducts an aeronautical study of the proposed construction or alteration. And, after it completes the study, the FAA issues a determination of whether the proposal "would be a hazard to air navigation." 14 C.F.R. § 77.31(a).

Defendants maintain that the regulatory restrictions associated with an operational TDWR should not affect the before-condemnation value because, after the FAA's one-year lease with Luminant expired and Defendants demanded that the FAA surrender possession, the FAA did not have a legal right to occupy the Property and operate the TDWR. But Defendants concede that TDWR facility's physical remnants may be factored into the before condition by, for example, subtracting the cost of removing such structures from the before condition to reduce Defendants' total

compensation.

The United States, on the other hand, argues that the FAA retained the legal authority to continue maintaining the TDWR facility on the Property according to the terms of the lease and the FAA's statutory authority to ensure the safety of air traffic. Thus, the United States argues, the restrictions on the parent tract imposed by the FAA's operating the TDWR on the date of taking must be factored into the before condition.

The United States further argues that, regardless of the one-year lease's expiration and its inability to negotiate a new lease with Defendants, the parent tract's before condition must account for physical conditions on the Property at the time that it was condemned. And, because the TDWR facility was physically present and in use on the date of condemnation, the United States contends that the parent tract's before-condemnation value must account for both the TDWR facility's physical attributes and its continued use.

**Legal Standards**

The Fifth Amendment to the United States Constitution "provides that private property shall not be taken for public use without just compensation." *United States v. Reynolds*, 397 U.S. 14, 15 (1970). "And 'just compensation' means the full monetary equivalent of the property taken. The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Id.* at 16 (footnotes omitted). "The guiding principle of just compensation ... is that the owner of

the condemned property 'must be made whole but is not entitled to more.'" *United States v. 564.54 Acres*, 441 U.S. 506, 516 (1970) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1943)).

Applying "the concept of market value," "the owner is entitled to the fair market value of the property at the time of the taking." *Reynolds*, 397 U.S. at 16 (footnotes omitted). "And this value is normally to be ascertained from what a willing buyer would pay in cash to a willing seller." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474 (1973) (internal quotation marks omitted).

When the United States acquires only a portion of a larger parcel of property, as it did in this case, compensation is measured by the difference between the fair market value of the entire property (or "parent tract") – not just the condemned portion – before and after the taking. *See United States v. 8.41 Acres of Land*, 680 F.2d 388, 392 (5th Cir. 1982). The United States Court of Appeals for the Fifth Circuit "requires the exclusive use of the before-and-after method of valuation, which computes damages to be the difference in the value of the entire parent tract before the taking and the value of the portion remaining after the taking." *Id.* at 392 n.5 (citing *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir. 1969)). "When the Government has physically acquired through its eminent domain powers a portion of a distinct tract of property, 'the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is

-7-

to be devoted.'" *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *United States v. Grizzard*, 219 U.S. 180, 183 (1911)).

> In determining fair market value, we must consider "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future ... to the full extent that the prospect of demand for such use affects the market value while the property is privately held." *Olson v. United States*, 292 U.S. 246, 255, 54 S. Ct. 704, 708, 78 L. Ed. 1236 (1934).
> Potential uses must overcome a presumption in favor of the existing use. A landowner can overcome this presumption only by showing a reasonable probability that the land is adaptable and needed for the potential use in the near future. *United States v. 8.41 Acres of Land*, 680 F.2d 388, 394-95 (5th Cir.1982). If there is no reasonable probability that the property could be devoted to a suggested potential use, the court need not consider that use in determining the fair market value of the property. "Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for ascertainment of value." *Olson*, 292 U.S. at 257, 54 S. Ct. at 709.
> Even if the landowner shows that a potential use is profitable and that the property is adaptable for that use, that use is not necessarily the measure of the value of the property. *Olson*, 292 U.S. at 255, 54 S. Ct. at 708. Instead, it is to be considered to the extent the prospect of demand for the use affects market value. *Id.* The burden of establishing the value of the land sought to be condemned remains with the landowner. *United States ex rel. Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 273-76, 63 S. Ct. 1047, 1051-53, 87 L. Ed. 1390 (1943).

*United States v. Land, 62.50 Acres of Land More or Less, Situated in Jefferson Parish, State of La.*, 953 F.2d 886, 890 (5th Cir. 1992).

## Analysis

I.   The parent tract's before condition should account for only the physical

remnants of the TDWR facility.

The parties disagree on the extent to which the TDWR facility should affect the before condition of the parent tract. Although Defendants argue that an appraiser should consider only the TDWR facility's physical remnants – that is, the structures themselves and not the land restrictions that accompany an operational TDWR – the United States maintains that both the physical remnants and "the continued operation of the TDWR ... must be taken into account in valuing the property on the date of taking." Dkt. No. 34 at 17 of 19 n.15.

The parties' disagreement centers on two issues: (1) whether the FAA had legal authority to occupy the Property to operate the TDWR facility before the date of taking and (2) whether, regardless of the FAA's legal authority to occupy the Property, the TDWR facility's physical remnants should include the intangible regulations that restrict the parent tract.

Because (1) neither the one-year lease nor the governing statute authorized the FAA to continue occupying Property indefinitely, and because (2) the TDWR facility's physical remnants do not include regulations affecting its use, the undersigned concludes that the parent tract's before condition should account for only the physical remnants of the TDWR facility that remained on the Property on the date of condemnation.

    A.    **The FAA was not legally authorized to continue occupying the Property to operate the TDWR.**

The parties dispute whether the FAA had the right under the one-year lease or

-9-

statute to continue operating the TDWR even after the one-year lease term expired.

The United States does not argue that Defendants held the FAA to a new tenancy after the one-year lease expired. The United States instead maintains that its right to remain on the Property and continue operating the TDWR facility – despite the one-year lease's expiration, Luminant's selling the property, the FAA's inability to secure a new lease with Defendants, and Defendants' demanding that the FAA vacate the premises – originates from three sources: (1) Paragraph 1(c) of the one-year lease; (2) Paragraph 16 of the one-year lease; and (3) federal statute. The undersigned will review each of these sources in turn.

In Paragraph 1(c) of the one-year lease, Luminant gave the FAA

> the right to make alterations, attach fixtures, and erect additions, structures, or signs, in or upon the premises hereby leased, which alterations, fixtures, additions, structures, or signs so placed in or upon, or attached to the said premises shall be and remain the property of the government.

Dkt. No. 35 at 8 of 86.

Paragraph 1(c)'s text makes clear that Luminant granted the FAA the right to maintain the TDWR facility on the Property and that the TDWR facility belongs to the United States.

Paragraph 16 governed the FAA's responsibilities to Luminant at the end of the one-year lease term. Paragraph 16 provides:

> A. The Government shall surrender possession of the premises upon the date of expiration or termination of this lease, including any holdover periods. If the Lessor provides written notice, prior to the date of expiration or termination, requesting restoration of the premises, the

> Government at its option shall within ninety (90) days after such expiration or termination, or within such additional time as may be mutually agreed upon, either:
>
> (1) Restore the premises to as good condition as that existing at the time of the Government's initial entry upon the premises under this lease or any preceding lease (changes to the premises in accordance with paragraph 1(a), 1(b) and 1(c) above, ordinary wear and tear, damage by natural elements and by circumstances over which the Government has no control, excepted) or,
>
> (2) Make an equitable adjustment in the lease amount for the cost of such restoration of the premises or the diminution of the value of the premises if unrestored, whichever is less. Should a mutually acceptable settlement be made hereunder, the parties shall enter into a supplemental agreement hereto effecting such agreement or,
>
> (3) Offer abandonment of installed real property improvements in lieu of restoration or some combination of abandonment and restoration as determined by mutual agreement with the Lessor, so long as it is determined by the RECO to be in the best interests of the Government.

Dkt. No. 35 at 13 of 46.

Paragraph 16's text provides that if, before the one-year lease expired, Luminant had issued the FAA a written request to restore the Property, the FAA would have had three options: (1) restore the Property; (2) decline to restore the Property but pay Luminant the cost of such restoration or the diminution of the Property's value as unrestored; or (3) abandon the TDWR facility in lieu of restoration or some combination of abandonment and restoration determined by Luminant and the FAA's mutual agreement.

The one-year lease's text is silent on what would happen if the situation at hand arose – where Luminant did not make a written request that the FAA restore the

-11-

Property. Still, based on the express terms above, the parties agree that (1) the TDWR facility remains the property of the United States and (2) Defendants – and not the FAA – must bear the cost of restoration or diminution of the Property's value as unrestored. The parties also agree that the FAA was not required to remove the TDWR facility at the conclusion of the one-year lease. *See* Dkt. No. 39 at 5 of 16 (the United States explaining that the rights under the one-year lease "include the option not to remove improvements such as the TDWR erected under the preceding lease"); Dkt. No. 37 at 6 of 12 (Defendants noting that "the FAA was not obligated to remove the TDWR facility from the … Property").

As to whether the one-year lease permitted the FAA to occupy the Property after the lease expired, neither Paragraph 1(c) nor Paragraph 16 gave the FAA rights to operate the TDWR on the Property in perpetuity.

Paragraph 16 explicitly required the FAA to "surrender possession of the premises upon the date of expiration or termination of this lease, including any holdover periods." Dkt. No. 35 at 13 of 46. And, although, under Paragraph 1(c), the TDWR facility remains the property of the United States until it abandons the structures, the FAA's right under the one-year lease to occupy the Property ended at the very latest on September 21, 2015, when Defendants demanded that the FAA surrender possession of the Property in light of the parties' failed negotiations. The FAA had ongoing ownership of the physical TDRW facility structures, but the FAA did not have a right under the one-year lease to continue operating the TDWR facility on

the Property indefinitely. *Cf. United States v. Five Parcels of Land in Harris Cnty., Tex.*, 180 F.2d 75, 77 (5th Cir. 1950) ("[The landowners] owned property that the Government leased as a part of a project under leases that called for the privilege of occupancy of the lands for a term of years – not for the fee simple ownership. .... These contracts being valid and binding, the Government cannot, by determining that it wants to take entire title, abrogate, annul, or set at naught the lawful rights, privileges, and property of its lessees acquired under these contracts.").

The United States insists that, "even if the FAA relinquished authority to maintain and operate the TDWR on the [P]roperty and under the [one-year] lease, the FAA is separately authorized to maintain and operate the TDWR by statute." Dkt. No. 34-1 at 17 of 19. The United States points to 49 U.S.C. § 44502, which gives the Administrator of the FAA authority to "acquire, establish, improve, operate, and maintain air navigation facilities," 49 U.S.C. § 44502(a)(1)(A); and 49 U.S.C. § 46308, which provides criminal liability for a person who knowingly interferes with air navigation, *see* 49 U.S.C. § 46308(3).

But the undersigned is unpersuaded that these provisions give the FAA blanket authority to indefinitely occupy the Property without a lease, formally condemn the Property at a later date, and then pay compensation as though – prior to the date of condemnation – the FAA had a pre-existing and unending right to occupy the Property. While the United States may take private property for public use, the United States must pay just compensation based on the land as it would have existed but for the

taking. *See Reynolds*, 397 U.S. at 16. And here, after September 21, 2015 (at the latest), the FAA had no rights to continue occupying Property to operate the TDWR – regardless of whether anyone might have faced criminal charges if he interfered with air navigation.

> B. **The TDWR facility's physical remnants do not include the intangible restrictions imposed by an operational TDWR.**

The United States argues that, because "the TDWR physically existed on the subject property on the date of taking …, it would be improper to value the [parent tract] in the 'before' condition as if the TDWR did not exist." Dkt. No. 34-1 at 14 of 19. Defendants do not disagree – Defendants insist that the physical remnants of the TDWR facility should affect the parent tract's pre-condemnation value but argue that the regulatory restrictions imposed by an operational TDWR should not.

As discussed above, compensation in a case like this – where the United States condemns part of a larger parcel of property – is measured by the difference between the fair market value of the parent tract before and after the taking. *See 8.41 Acres of Land*, 680 F.2d at 392. And, in determining market value, the fact finder must look not only at the present use of the property but also "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson*, 292 U.S. at 255.

The Fifth Circuit has explained that a property's prospective uses are affected by both its physical characteristics and intangible regulatory restrictions. *See United States v. 320.0 Acres of Land, More or Less in Monroe Cnty., State of Fla.*, 605 F.2d 762,

818 (5th Cir. 1979). Indeed, "regulatory restrictions may preclude an otherwise possible use even more decisively than the inherent physical characteristics of a property. And it is clear that just compensation must be determined in light of such regulatory restrictions." *Id.*

Although, in its briefs, the United States does not distinguish between the TDWR facility's physical structures and the intangible restrictions that an operational TDWR imposes, the United States appears to contend – relying on *Rasmuson v. United States*, 807 F.3d 1343 (Fed. Cir. 2015) – that, because the TDWR facility physically existed on the Property prior to condemnation, the parent tract's before condition must account for the TDWR's ongoing use and the regulatory restrictions associated with an operational TDWR.

In *Rasmuson*, the plaintiffs owned tracts of land adjacent to three railway corridors. *Id.* at 1344. The government imposed easements on the plaintiffs' parcels through Notices of Interim Trail Use ("NITUs"), which "'preserve established railroad rights-of-way for future reactivation of rail service' and permit the railroad operator to cease operation without legally abandoning any 'rights-of-way for railroad purposes.'" *Id.* (quoting 16 U.SC. § 1247(d)). The trial court found that a taking had occurred because, "[b]ut for issuance of the NITU[s], ... the [railway] easement[s] would have reverted back to plaintiffs upon cessation of railroad operations, and plaintiffs would have enjoyed land unencumbered by any easement." *Id.* (quoting the trial court).

The trial court determined just compensation by the "before and after" method

of determining the value of the land subject to the government's easement. *See id.* at 1345. "The court determined that the 'before' state of the land should take into account the value of the land as it existed before the NITU easements, but ignore any physical remnants of the railway's use, which would have remained if the railway easement had been permitted to lapse." *Id.* The government appealed.

The United States Court of Appeals for the Federal Circuit explained:

> The issue on appeal is a narrow one. The parties dispute whether or not the "before" condition requires the appraiser to adopt the counterfactual assumption that the expiration of the prior easement – i.e. the easement belonging to the railway – would return the property to the landowners free of the physical remnants of the railway's use. The landowners view the "unencumbered" land as not only free of any legal restrictions, but also free of any remnants from the railway's use of the easement such as earthen embankments, ties, and poor soil conditions. The government, however, views the "before" condition as the land as it would have laid but for the issuance of the NITUs, which could include the physical remnants of the railway's use of the land in some circumstances.
>
> We conclude that the fair market value of the land includes the physical remnants of the railway that would have remained on the landowners' property but for the issuance of the NITUs. Here, the trial court found – and the parties do not contest – that but for the government's easement, the railway easements would have lapsed and the land would have returned to the landowners. Because the railway companies did not have an obligation to remove the physical railroad construction features, and there is no evidence in the record that they would have done so, the landowners would have regained possession of their land with the physical structures. Absent the NITUs, the land would have returned to the landowners with the physical remnants of the railway. A proper appraisal methodology has to account for those physical conditions.

*Rasmuson*, 807 F.3d at 1345-46 (citation omitted).

Unlike in *Rasmuson*, the parties here agree that the TDWR facility's physical

-16-

remnants should be taken into account in evaluating the before condition. Before the United States formally condemned the Property, the FAA's lease to the Property had expired and – despite the FAA's continued use of the Property – Defendants were entitled to possession of their land, as discussed above. But, because the FAA had no obligation to remove the physical TDWR facility – and there is no evidence that the FAA intended to – Defendants would have taken possession of the Property with the TDWR facility still on the land. The appraiser must therefore account for these physical remnants of the TDWR facility structures in determining the parent tract's value prior to condemnation.

But neither *Rasmuson* nor the other cases cited by the United States instruct that the appraisal method for valuating the parent tract's before condition must take into account the regulatory restrictions that accompany the TDWR's continued use merely because the TDWR facility physically existed on the date of condemnation. Despite the expected physical presence of railway remnants on the land in *Rasmuson*, the land's before condition was "free of any legal restrictions." *Id.* at 1345. The trial court found that had the government not effected a taking – had the NITUs not been issued and the railway easements had lapsed – the land would have reverted back to the landowner's free of an operational railway, even if remnants of a railway were still in place. *See id.* at 1345-46.

The same is true here. Had the United States not condemned the property and had the FAA, as Defendants demanded, returned the Property to Defendants, the

-17-

Property would have belonged to Defendants free of any right of the FAA to occupy it – despite the TDWR facility's remaining. And that the FAA continued to use the Property without Defendants' permission does not make the FAA's operating the TDWR a part of the Property's pre-condemnation value. Even where, at the time of taking, the government has a valid lease and right to temporarily occupy the property, the condemned land is valued as though possession of and title to the land would revert back to the landowner. *See Five Parcels of Land*, 180 F.2d at 76.

The undersigned is unaware of – and the United States fails to cite – any case where, because the government was already using private land without permission before condemning it, the land's pre-condemnation value was determined as though the land was and would always be used by the government in the way that the government had chosen.

Because Defendants were entitled to possess the Property with the TDWR facility's physical structures remaining but free of the FAA's entering the Property to operate the TDWR, the parent tract's before-condemnation value should account for only the TDWR's physical remnants and not the restrictions imposed by the TDWR's continued use.

## Recommendation

For the reasons explained above, the Court should make a determination that, in valuing the parent tract before condemnation, an appraiser should consider only the TDWR facility's physical remnants and not the intangible restrictions associated with

an operational TDWR and, in doing so, should direct the Clerk of the Court to terminate the United States's Motion for a Legal Determination on the Before Condition of the Subject Property [Dkt. No. 34].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: June 5, 2018

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE